724 F.Supp. 744 (1989)
In re AIR PASSENGER COMPUTER RESERVATIONS SYSTEMS ANTITRUST LITIGATION.
This Document Relates To
USAIR, INC., Pacific Southwest Airlines, Inc., Aircal, Inc., Ozark Air Lines, Inc., Republic Airlines, Inc., Muse Air Corporation, Alaska Airlines, Inc., Midway Airlines, Inc., Northwest Airlines, Inc., and Western Airlines, Inc., Plaintiffs,
v.
AMERICAN AIRLINES, INC., and United Air Lines, Inc., Defendants.
Master File Nos. MDL 667-ER(Tx), CV 84-8918-ER(Tx).
United States District Court, C.D. California.
November 3, 1989.
*745 Blecher & Collins, Maxwell Blecher, Norman Pine, Beverly Tillett, Los Angeles, Cal., for plaintiffs.
Gibson, Dunn & Crutcher, Robert E. Cooper, J. Edd Stepp, Jr., Steven C. McCracken, Los Angeles, Cal., for defendants.

MEMORANDUM OPINION AND ORDER
RAFEEDIE, District Judge.
The plaintiffs, a group of ten airlines, filed this antitrust action against defendants United Airlines and American Airlines ("American"), claiming damages from monopolization by each defendant of the Computer Reservations Systems industry. The plaintiffs have brought a motion requesting that the Court resolve a contract dispute between the plaintiffs and American, which acquired AirCal, Inc. ("AirCal"), one of the plaintiffs in the action, regarding the payment of AirCal's obligations for attorneys' fees in the underlying antitrust action. The Court has treated this request as a Motion for Declaratory Judgment. For the following reasons, this Court holds that American Airlines, as successor in interest to AirCal, is obligated under the contract entered into between AirCal and the other plaintiffs to pay the attorneys' fees specified in paragraph 8(b) of that contract.

FACTUAL BACKGROUND
Prior to the commencement of this litigation, the plaintiffs, including AirCal, entered into a contract with each other known as the "Plaintiffs' Agreement." Under paragraph 8(b) of the Plaintiffs' Agreement, any plaintiff which withdraws from the litigation is responsible for its allocated portion of the fees and expenses of the litigation for a period of thirty-six months following withdrawal. Since the commencement of the litigation, a number of the plaintiffs have withdrawn from the litigation. Some have reached settlement agreements with one or both of the defendants, while others have been acquired by non-plaintiff airlines which did not wish to continue with the litigation. Prior to the withdrawal of AirCal, all the withdrawing plaintiffs have continued to pay their allocated portion of the attorneys' fees owed under paragraph 8(b) of the Plaintiffs' Agreement.
AirCal withdrew from the litigation after it was acquired by American. American, which acknowledges that it is successor in interest to the contract obligations of AirCal, claims that it is not bound to honor the contract on two grounds: (1) the term "withdraw" in the Agreement does not cover the situation in which a plaintiff is merged into a defendant, and (2) that the contract provision at issue is void as to public policy because it inhibits settlements. The plaintiffs claim that the contract is unambiguous regarding AirCal's continuing obligations under the agreement after withdrawal from the litigation, and *746 that the contract has not and does not inhibit settlements.

I. JURISDICTION
The first issue before the Court is the question whether it has jurisdiction to resolve this contract dispute. A number of 9th Circuit decisions indicate that the Court properly has ancillary jurisdiction over attorney fee disputes when the Court had proper jurisdiction in the underlying case. In Schmidt v. Zazzara, 544 F.2d 412 (9th Cir.1976), the defendant argued that the district court erred in retaining jurisdiction over the question of attorney's fees after a consent judgment had been entered. The Ninth Circuit held that "Allowance of attorney's fees `is part of the historic equity jurisdiction of the federal courts,' and the district court could properly retain jurisdiction to determine appropriate attorney's fees ancillary to the case." Id. at 414 (quoting Sprague v. Ticonic Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939)).
Similarly, the Ninth Circuit has stated that "prior decisions of this Court have established that the question of attorney's fees is ancillary to the underlying action and survives independently under the Court's equitable jurisdiction." United States v. Ford, 650 F.2d 1141, 1143-44 (9th Cir.1981) (cites omitted) cert. denied sub nom Midwest Growers Cooperative v. United States, 455 U.S. 942, 102 S.Ct. 1437, 71 L.Ed.2d 654 (1982).
The contract dispute in this case concerns the attorneys' fees owed by the parties in the same case in which this Court already has jurisdiction under 15 U.S.C. § 15. Although the claim of AirCal was dismissed with prejudice after the acquisition by American, as in Schmidt and Ford it is proper for the Court to retain jurisdiction to settle the ancillary issue under its equitable jurisdiction.

II. INTERPRETATION OF THE CONTRACT
Both parties are relying on the four corners of the contract in requesting the Court to determine whether or not American owes attorneys' fees to the other plaintiffs under the terms of the Plaintiffs' Agreement. American claims that the term "withdraw," as defined by the contract, is ambiguous, but presents no extrinsic evidence to resolve the alleged ambiguity. Instead, it claims that the Court need not reach the ambiguity because the definition contained in the contract must be narrowed by the Court to avoid an absurd and unreasonable result.
"In the absence of conflicting extrinsic evidence, the interpretation of a contract is a question of law," Market Ins. Corp. v. Integrity Ins. Co., 188 Cal.App.3d 1095, 1098, 233 Cal.Rptr. 751 (1987) (citing Parsons v. Bristol Development Co., 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839 (1965); see also, Sayble v. Feinman, 76 Cal.App.3d 509, 512, 142 Cal.Rptr. 895 (1978); Kusmark v. Montgomery Ward & Co., 249 Cal.App.2d 585, 587, 57 Cal.Rptr. 678 (1967) (It is solely a judicial function to interpret a written instrument unless the interpretation turns on credibility of extrinsic evidence). Therefore, it is appropriate for this Court to decide whether the terms of Plaintiffs' Agreement require that American pay AirCal's allocated share of attorneys' fees for the 36 months following its withdrawal by merger into American Airlines.[1]

A. Ambiguity.

Section 8 of the Plaintiffs' Agreement is entitled "Withdrawal." Paragraph (b) of this section reads:
Except as provided in paragraph 7 ("Appeal"), if any party withdraws from the litigation after the filing of the complaint(s) such party's obligation to share in legal fees and expenses as provided in paragraph 4 shall continue for 36 months after such withdrawal to the same extent and in the same manner as if it had not withdrawn, provided however that if a party withdraws within 30 days of the time of filing an amended complaint because it objects to such amendment, and *747 the Steering Committee finds that such amendment involves a material change in the theory of plaintiffs' case, the withdrawing party shall be liable only for its share of legal fees and expenses up to the time of its withdrawal.
Plaintiffs' Agreement at 6. American argues that "withdraw" under the terms of this paragraph should apply to all other plaintiffs who have either settled or withdrawn after being merged with a non-plaintiff, but not to them. In arguing that the term "withdraw" is ambiguous, American does not address the definition of the term contained in paragraph 8(g):
A withdrawal within the meaning of this section includes any termination of a plaintiff's participation in the case by settlement or otherwise except for a multi-plaintiff settlement related to the common purpose which has received the necessary approval under paragraph 10, "Settlement."
Plaintiffs' Agreement at 7 (emphasis added).
To withdraw means "to abandon the prosecution of: cease to proceed with," while otherwise is defined as "in a different way or manner, in different circumstances, under other conditions." Webster's Third New International Dictionary (Unabridged 1986). It seems clear that the plaintiffs wished to cover unforeseen eventualities by defining the term withdraw to include "by settlement or otherwise." In other words, the obligations of a withdrawing plaintiff should continue regardless of the method of withdrawal, or for what reasons. It is difficult to see how paragraph's 8(c) and 8(g), when read together, can be viewed as ambiguous.
California law is straightforward. "It is clear, however, that if the provisions of a contract are not ambiguous, it is the duty of the court to enforce the contract as written and agreed upon by the parties." Div. of Labor Stand. Enf. v. Dick Bullis, Inc., 72 Cal.App.3d Supp. 52, 56-57, 140 Cal.Rptr. 267 (1977) (citing Lomanto v. Bank of America, 22 Cal.App.3d 663, 99 Cal.Rptr. 442 (1972)); Gruen Watch Co. v. Artists Alliance, Inc., 191 F.2d 700, 703 (9th Cir.1951). American is asking the Court to construe the contract in such a way as to eliminate AirCal's obligation. However, "Where there is no ambiguity, there is nothing to be construed. And a court cannot and should not do violence to the plain terms of a contract by artificially creating ambiguity where none exists." Yoshida v. Liberty Mutual Insurance Co., 240 F.2d 824, 826-27 (9th Cir.1957) (cites omitted).
Even if the Court were to agree with American that the term "withdraw" may be ambiguous, the intentions of the parties at the time of contracting, as shown by the wording of the entire contract, does not reveal any interpretation other than that of the plaintiffs, nor does it reveal any conflict with other sections of the contract.

B. Conflicting Clauses and the Parties' Intention.

American contends that the term "withdraw" cannot include withdrawal because of merger into a defendant because this meaning would conflict with two other clauses in the contract. Specifically, American cites paragraph 8(c):
If any party withdraws or ceases to participate in the litigation after the filing of the complaint(s), it shall, without charge to the remaining plaintiffs, make available reasonably to common counsel any records necessary for the prosecution of the case and shall make any of its personnel available to common counsel for interviews, depositions or as witnesses in the lawsuit.
Plaintiffs' Agreement at 6. American argues that AirCal's inability to cooperate with plaintiffs' counsel and support the litigation against American once it has merged with American renders this clause absurd when withdrawal occurs as a result of a plaintiff merging with a defendant. It claims that this provision only has meaning if a former plaintiff remains an independent entity whose interests are not in direct conflict with the continuing plaintiffs.
However, the word "reasonably" seems to mean that a former plaintiff will only continue to cooperate in the litigation if it *748 is reasonable to do so. There are other situations in which a former plaintiff may not be able to cooperate with the remaining plaintiffs. For instance, if the terms of a settlement with a defendant require the former plaintiff to cease cooperating with the remaining plaintiffs, or if the former plaintiff has been merged into a non-plaintiff airline which is undertaking any type of delicate negotiations with a defendant which could be jeopardized by continuing cooperation with the remaining plaintiffs.
American also argues that plaintiffs' interpretation of the Agreement is in conflict with the "common purpose" of the Agreement, contained in paragraph 1(a):
The purpose of joining together as plaintiffs is to secure the economic and other advantages of using common counsel to achieve a common purpose. The "common purpose" is to obtain appropriate relief in court from the harm which the defendants have caused and are continuing to cause plaintiffs through the ownership and operation of defendants' computer reservations systems in violation of the antitrust laws.
Plaintiffs' Agreement at 1. American contends that, since the common purpose is to attack the defendants in court, it could never have been the intention of the parties that American would someday be forced to fund the attack on itself. American never addresses why it should not, under its reading of the contract, pay for the continued litigation against United.
However, in reading the contract as a whole, it is clear that the plaintiffs entered into an agreement to secure "economic and other advantages" of using common counsel. During the years that AirCal participated in the litigation, it was able to pursue expensive litigation against American and United at a fraction of the cost it would have otherwise incurred as an individual plaintiff, because it received the benefit of the payments to counsel of its co-plaintiffs. In exchange, each plaintiff incurred the obligation to continue with such payments for 36 months after a withdrawal, so that the remaining co-plaintiffs would not suddenly find themselves burdened with the entire cost of pursuing the litigation.
In order to protect themselves from the risk of sudden changes of heart and/or settlements by plaintiffs who had received the past benefits of the litigation at reduced costs, all of the plaintiffs executed the agreement. The economic loss to the remaining plaintiffs is the same whether a withdrawing plaintiff has settled, has suffered a change of heart, has merged into a non-plaintiff airline which is not interested in pursuing the litigation, or has been merged into a defendant. The definition of withdrawal in the Agreement which encompasses withdrawal by settlement or otherwise, seems to indicate a clear intent to cover any reason for withdrawal.

C. The California Civil Code.

Defendants rely heavily on State Farm Fire & Cas. Co. v. Tan, 691 F.Supp. 1271 (S.D.Ca.1988), in which the insurance contract which the court was construing failed to mention whether the insurance company's right to examine the insured included the right to examine each insured separately, when determining whether a fraud was being perpetrated on the company. Id. at 1274. The court held, when applying California law:
No contract can anticipate every possible contingency. Inevitably, a court will be called upon to adjudicate an issue that the contracting parties failed to address.... California requires a court in such a situation to "flesh out" the express terms of the contract to effectuate the broader intentions of the parties.
Id. (citing California Civil Code § 1636).
However, unlike the situation in State Farm, the contingency of a withdrawal from litigation for any reason at all was anticipated in the Plaintiffs' Agreement. Thus, there is no need for the Court to "flesh out" the express terms of the contract. This view is consistent with the California Civil Code's sections covering interpretation of contracts. For instance, section 1636 states, "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the *749 time of contracting, so far as the same is ascertainable and lawful." (emphasis added). American is asking the Court to look at the circumstances of the parties at the time AirCal withdrew, not at the time AirCal entered into the contract. However, "whether a contract is fair or works an unconscionable hardship is determined with reference to the time when the contract was made and cannot be resolved by hindsight." Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 875 (9th Cir.) cert. denied 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).
Also, the California Civil Code requires that, "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." Cal.Civ.Code § 1639 (Deering 1989). Since the intention of the parties to protect themselves, economically, from the higher costs of pursuing the litigation after some parties withdraw, is evident from the writing itself, there is no need to search for another intention, as American would have the Court do.
In In re Estate of Wemyss, 49 Cal. App.3d 53, 122 Cal.Rptr. 134 (1975), the court, applying section 1639 of the Civil Code to the interpretation of a contract noted, "In the absence of fraud or mistake, the intention of the parties as expressed in their agreement is controlling, and the courts are not empowered under the guise of construction or explanation to depart from the plain meaning of the writing and insert a term or limitation not found therein". Id. at 60, 122 Cal.Rptr. 134 (citing Apra v. Aureguy, 55 Cal.2d 827, 13 Cal. Rptr. 177, 361 P.2d 897 (1961)). American has made no allegations of fraud or mistake, but still wants the Court to insert a limitation into the Agreement so that a new exception to the attorneys' fee obligation will appear.

D. Absurdity.

American cites § 1638 of the California Civil Code, which states, "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." It claims that it is patently absurd to expect American to now pay for part of the litigation against itself. However, circumstances often change after a contract is signed, which creates a hardship on one of the parties. When American acquired AirCal it assumed all of Air Cal's contractual obligations, and undoubtedly found itself obligated to pay for many goods and services which it then did not want or need. That is not an absurdity, it is the reality of a corporate merger.
Even if contractual obligations turn out to be more onerous than anticipated, that does not excuse the obligation. "[T]he courts cannot rewrite a contract to avoid difficulty or hardship." Wyandotte Orchards, Inc. v. Oroville-Wyandotte Irr. Dist., 49 Cal.App.3d 981, 988, 123 Cal.Rptr. 135 (1975); Hinckley v. Bechtel Corp., 41 Cal.App.3d 206, 212, 116 Cal.Rptr. 33 (1974) ("Courts cannot make for the parties better agreements than they themselves made or rewrite contracts because they operate harshly or inequitably as to one of the parties.").
American is asking the Court to rewrite the contract signed by all the plaintiffs because it operates harshly as to American. However, it is not an absurdity that American acquired contractual obligations that are distasteful to it when it acquired AirCal, or at least not sufficiently an absurdity as to require the Court to rewrite the contract.
In fact, the cases cited by American, in which courts have altered contracts to avoid an absurd or unreasonable result simply are not analogous to the facts now before the Court. In Heidlebaugh v. Miller, 126 Cal.App.2d 35, 271 P.2d 557 (1954), the court noted that the phrase "with or with notice," in a contract which, in other sections read "with or without notice," led to an unreasonable result. Therefore, the court interpreted the phrase as "with or without notice." Id. at 40. The Heidlebaugh court was correcting an obvious typographical mistake in the contract, a far different case from the present, where American is asking the Court to ignore the *750 entire section of the contract which defines the term "withdrawal" in the contract.
In Pacific Tel. & Tel. Co. v. City of Lodi, 58 Cal.App.2d 888, 137 P.2d 847 (1943), the court noted that one clause of the contract had no clear meaning at all when read by itself, but could be interpreted in light of the entire contract and the stated purpose of the contract. Id. at 892, 137 P.2d 847. American cites this case as authority for reinterpreting the meaning of "withdraw" in the Plaintiffs' Agreement so as not to include withdrawal by merger into a defendant. However, the meaning of the term withdraw is clear in the contract, and, as shown above, is consistent already with the stated purpose of the contract without redefining the term for the benefit of American.
Finally, American cites at great length Petro v. Ohio Cas. Ins. Co., 95 F.Supp. 59 (S.D.Cal.1950), in which the court determined that the term "student pilot" as used in the insurance contract as an exclusion of coverage did not apply to a person who had a pilot's license, but was attending school to obtain a commercial license. Id. at 63. American states that this case stands for the proposition that a court is free to narrow the definition of a seemingly clear word in order to avoid an absurd and unreasonable interpretation. However, American fails to note that the Petro court was construing an insurance policy, which must be construed liberally in favor of the insured. Id. at 60-61. Also, the court noted that the narrowing of the definition of "student" was necessary to avoid a conflict between clauses in the same contract. As noted above, there is no conflict between the definition of "withdraw" in the Plaintiffs' Agreement and the other clauses in the Agreement.
Thus, the cases cited by American do not support its position that the contract before the Court leads to an absurd or unreasonable result which the Court must avoid by adding a limitation to the words of the contract which were not placed there by the signing parties. "[C]ourts are loath to impose limitations or restrictions upon the parties which are not expressly contained in their agreement...." Republic Pictures Corp. v. Rogers, 213 F.2d 662, 665 (9th Cir.), cert. denied 348 U.S. 858, 75 S.Ct. 83, 99 L.Ed. 676 (1954).

E. Listing of Enumerated Exceptions.

Finally, in interpreting the contract, it is important to note that the contract, itself, enumerates specific exceptions to the ongoing attorneys' fee obligations set out in paragraph 8(b):
1. Withdrawal by a party before the Complaint is filed (Paragraph 8(a)):
2. Withdrawal by a plaintiff after entry of a final judgment and prior to the filing of an appeal (Paragraphs 7 and 8(b));
3. Withdrawal of a plaintiff within thirty (30) days of the time of filing an amended complaint because it objects to such amendment (Paragraph 8(b)); and
4. A multi-plaintiff settlement related to the common purpose of the litigation and which has received the necessary approval of the Steering Committee.
Under the long accepted maxim expressio unius est exclusio alterius, the presence of a specific list of exceptions implies that the specific list is exclusive, and the Court should not imply another exception. 3 Corbin on Contracts § 552.

III. PUBLIC POLICY
American argues that well settled contract principles require that provisions contrary to some rule of public policy are to be held to be unenforceable. However, as the Supreme Court noted when reviewing whether or not enforcement of a collective bargaining agreement was contrary to public policy, "If the contract as interpreted ... violates some explicit public policy, we are obliged to refrain from enforcing it. Such a public policy, however, must be well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interest.'" W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); see also Stead Motors v. Automotive Machinists, 886 F.2d 1200 (9th Cir. *751 1989) (the public policy exception defined in W.R. Grace in the context of enforcing an arbitrator's interpretation of a collective bargaining agreement is a specific application of general contract interpretation).
The cases cited by American, and the arguments which they put forth are not persuasive that the general policy of favoring settlements is so well defined and dominant, or supported by laws or legal precedents, such that the clause in the Plaintiffs' Agreement should be found void.

A. Discouraging Dismissal and Inhibiting Settlements.

American cites to a 1915 New York case and a 1920 California case which provide that an agreement between an attorney and client which provides for a contingent fee for the attorney with a minimum fee in the event of settlement, does not entitle the attorney to the minimum fee if the client chooses not to prosecute the litigation. Hall v. Orloff, 49 Cal.App. 745, 194 P. 296 (1920) (citing with approval, Andrews v. Haas Bros., 214 N.Y. 255, 108 N.E. 423 (1915)). In each of these cases, the courts were concerned with the public policy issue of a client's right to discharge his attorney or dismiss litigation without prosecuting it. However, these cases are simply not applicable to the issues raised in this contract.
The contract at issue is between the plaintiffs, not between the plaintiffs and their attorney. The contract does not prohibit the plaintiffs from dismissing their attorney, and, in fact, the contract explicitly states that "In the event it is dissatisfied with work of common counsel, the steering committee shall have the right to retain replacement counsel and negotiate a termination of the arrangements with the original common counsel." Plaintiffs' Agreement ¶ 3. What the plaintiffs may have owed their attorneys if they had unanimously consented to dismiss the litigation is not before this Court. The Agreement merely allocates the attorneys' fees, whatever they might be, among the various Plaintiffs.
The only recent case cited by American for the proposition that attorneys' fees awards after settlement will discourage settlements is also not applicable to the facts of this case. In Diaz v. Robert Ruiz, Inc., 808 F.2d 427 (5th Cir.1987), the Fifth Circuit held that, under a Texas statute providing for attorneys' fees, there could be no award of attorneys' fees absent a trial court judgment on liability. Thus, the plaintiffs could not receive an award of attorneys' fees under that statute since they had settled on the eve of trial. Id. at 428. After the holding, the Court went on, in dicta, to state, "To allow recovery for attorneys' fees on claims that are settled before trial [pursuant to statute] as plaintiffs propose, would discourage settlements of contract disputes by adding legal fees to the underlying amounts in dispute, somewhat like a penalty." Id.
However, this statement, which might serve as a justification for the rationality of the Texas statute, does not mean that all contract clauses which require payment of attorney fees upon settlement are void as against public policy. This case was in the context of requiring one party to pay the attorney's fees of the other party under an attorneys' fee statute. Clients routinely sign contingency fee contracts which require large, and even minimum payments, if the issue is settled rather than litigated. These contracts are far different from those litigated in Orloff and Andrews, which created a penalty if the client dismissed the action, or from Ruiz, where the losing party must pay attorney's fees after a judgment is entered.
For instance, in Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866 (9th Cir.) cert. denied 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), Telex argued that it should not have to pay a minimum contingent fee of $1,000,000 which its contract with the law firm required would be paid after a Petition for Writ of Certiorari was filed by the law firm in the event of either settlement or judgment of its claims against IBM. Id. at 869. The Ninth Circuit held that Telex had clearly settled its claims against IBM (but without a monetary recovery), and the contract clearly covered such a settlement. Additionally the *752 Court held that the fee was not so excessive as to render the contract unenforceable, nor was the amount unconscionable under the circumstances. Id. at 875.
Clearly, if a $1,000,000 minimum fee does not "discourage" settlement, the contract clause at issue here does not "discourage" settlement. Every party to a lawsuit must bear the expenses of his attorney, even if the case settles. In fact, PanAm, Western, Ozark, USAir and AirCal have all settled as to both American and United, and Muse, Alaska, and Midway have settled with American only and Northwest has settled with United. All the withdrawing or settling plaintiffs, including those merged into other airlines, have continued to pay the attorneys' fees as called for by Paragraph 8(b) of the Plaintiffs' Agreement. In view of the numerous settlements, it is simply not reasonable to assert that the fee sharing arrangement among the plaintiffs inhibits settlement.
American also argues that antitrust law seeks not only to encourage settlement, but especially endeavor to encourage partial settlement, as opposed to awaiting global settlement. However, the cases cited to support this proposition do not apply to the facts before the Court. In Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), the Court addressed the issue of whether the release of one joint tortfeasor releases other tortfeasors who are not parties to or named in the release. Id. at 342, 91 S.Ct. at 808. The Court found that the Court of Appeals erred in following the ancient common-law rule, and held that the modern approach, adhered to in the Restatements (Second), Torts § 885 is the better rule, because it enables a party to settle with one defendant, and retain the right to pursue its claims with joint tortfeasors without an explicit reservation of rights clause in the release. Id. at 346-47, 91 S.Ct. at 810-11.
The Supreme Court noted that adoption of the Restatements view would promote settlements, while the adoption of the common-law rule would frustrate such partial settlements. Id. American argues that the Plaintiffs' Agreement promotes multi-plaintiff settlement, since withdrawal under a multi-plaintiff settlement is the only way a plaintiff can avoid the three year attorney's fee obligations.
From the statement by the Supreme Court that partial settlements are favored by the antitrust laws, American concludes that this contract provision is void as against public policy. However, a general policy in favor of partial settlements is not "well defined and dominant" and thus does not meet the Supreme Court's standard for refusing to enforce contractual obligations. See W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983).

B. Penalty.

American argues that the proper measure of fees upon discharge of an attorney is the reasonable value of services rendered up to the time of termination. They cite Fracasse v. Brent, 6 Cal.3d, 784, 100 Cal. Rptr. 385, 494 P.2d 9 (1972) for this proposition, and claim that, therefore, the three-year attorney's fee provision is void because it imposes a substantial penalty on a settling plaintiff for exercising its inherent right to discharge its attorney and remove itself from the antitrust litigation.
However, the issue addressed in Fracasse is clearly different from the AirCal situation. Fracasse dealt with the penalty exacted by forcing a client to pay the attorney's full fee when the client chose to discharge the attorney and retain different counsel. Id. 100 Cal.Rptr. at 389, 494 P.2d at 13. In this case, AirCal entered into a contract with other airlines to pursue joint litigation. The contract terms require a settling or withdrawing plaintiff to continue to shoulder some of the expenses of the litigation, which was entered into jointly. This is not a contract between an attorney and a client, it is a contract between independent companies which wish to share to the costs of litigation.
The plaintiffs have not discharged Blecher & Collins. Clearly, the fee to Blecher & Collins will be the same regardless of whether AirCal is required to pay or not. *753 If AirCal is not obligated under the Plaintiffs' Agreement, the remaining plaintiffs and prior withdrawing plaintiffs will simply have to pay a greater proportion of the fee. Therefore, to protect the legitimate expectations of the parties who entered into the contract, American Airlines, as successor in interest to AirCal, is obligated to pay the attorneys' fees specified in paragraph 8(b) of that contract.
NOTES
[1] The parties have stipulated that California law should govern the interpretation of the contract.